Mark Crabtree, OSB #015070
mark.crabtree@jacksonlewis.com
Anthony Copple, OSB #163651
anthony.copple@jacksonlewis.com
JACKSON LEWIS P.C.
200 SW Market St., Ste. 540
Portland, Oregon 97201
Telephone: (503) 229-0404
Facsimile: (503) 229-0405
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| EVERETTE D. TRAVIS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>INTEL CORPORATION, a foreign corporation, JACOB HODGIN, an individual, and JAMES SCHAMMERHORN, an individual,<br><br>Defendants. | Case No. 3:25-cv-00230-MO<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Oral Argument Requested** |

## CERTIFICATE REQUIRED BY L.R. 7.1

Pursuant to Local Rule 7-1(a)(1), the undersigned counsel certifies that Defendants' counsel conferred with Plaintiff regarding the issues raised by this motion. No agreement could be reached without intervention of this Court.

## MOTION

Defendants Intel Corporation ("Intel" or the "Company"), Jacob Hodgin ("Hodgin"), and James Schammerhorn ("Schammerhorn") (collectively "Defendants"), by and through their

undersigned counsel, hereby move for summary judgment in their favor and against Plaintiff Everette Travis ("Plaintiff" or "Travis") on the employment-related discrimination and retaliation claims asserted in Plaintiff's Complaint.[1] This motion is brought pursuant to Federal Rule of Civil Procedure 56 and supported by the following memorandum of law, along with the Declarations of Anthony Copple, Jacob Hodgin, James Schammerhorn, and Chad Chamberlain.

Summary judgment is appropriate because no genuine issue of material fact exists, and Defendants are thus entitled to judgment as a matter of law.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

In July 2022, Intel hired Travis as a Manufacturing Equipment Technician (an "MET"). Like other METs employed at Intel, Travis was expected to proceed through various tool-specific trainings for the tools used throughout Intel's fabrication plant (the "fab") in the process of semiconductor manufacturing. Travis mistakenly believed it was important to advance in his Level 1 training as fast as possible. Accordingly, when he did not achieve a Level 1 certification as quickly as he wanted (based on his own self-assessment of his skillset), he began accusing those involved in the training process of nefarious intentions. For example, two months after starting with Intel, Travis asked his trainer to certify him on the Level 1 training for the Rapid Thermal Anneal tool and, at the same time, threatened to involve Human Resources ("HR") if his request for certification was denied. Travis repeatedly proclaimed that he was ready for advanced work assignments. When Intel managers did not agree that Travis had met the requirements for Level 1 certification, Travis accused the managers of being racists.

After learning that Intel managers did not agree that Travis was ready for Level 1 certification or advanced work assignments, Travis became antagonistic and openly insubordinate. He, admittedly, ignored direct work instructions. For instance, Intel management directed Travis (along with all other METs) to avoid incurring overtime and, in particular, to avoid attending

[1] Intel reserves for later decision the substance of Intel's counterclaims against Travis.



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

morning engineering pass-down meetings, which were specific to the exempt employees, not the non-exempt METs. Travis repeatedly disregarded this instruction, insisted that it was important to his development to attend engineering pass-down meetings (and incur associated overtime pay), and further insisted that management's directives that he attend the appropriate MET pass-down meetings were discriminatory. When managers attempted to manage Travis's open insubordination, Travis characterized the legitimate, constructive feedback and performance management as retaliation.

Intel's training program for METs is focused on ensuring METs are, as a whole, skilled in their craft. METs who demonstrate proficiency on tool training, operation, and safety are certified as Level 1 proficient. METS who grow and demonstrate higher-level expertise can, in some instances, advance to Level 2 certification. In other instances, METs might commence Level 1 training on a different tool. Building this proficiency at tool operations at each training level and on each tool takes multiple months. It is a marathon, not the sprint that Travis erroneously believed it was. Ultimately, MET training curricula are driven by operational needs, in combination with individual employee's stated interests and skillsets. A MET's career advancement or mobility does not depend on the speed at which METs complete training– some successful METs may train for years in a particular tool module. Unfortunately, Travis failed to understand the goals and timeframes associated with Intel's MET training plans, which led him to attribute unlawful intentions to otherwise routine business decisions.

This case is entirely about shadows that Travis believes he saw while working at Intel. When Intel's decisions are fully illuminated (as they are in this Motion), the nefarious intentions that Travis attributes to Intel managers are explained away. Summary judgment in Intel's favor is appropriate because Travis cannot establish the elements of his claims and every employment action at issue is supported by legitimate, business-related reasons, to which Travis cannot offer evidence to show otherwise.


**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

## II. STATEMENT OF FACTS

### A. Intel Trains METs to Become Master Craftsmen

New hires assigned to work in Intel fabs, including METs, participate in a structured onboarding program designed to introduce them to Intel's environment, expectations, safety obligations, and foundational training requirements. Hodgin Decl. ¶ 2. First, new hires complete a multi-day general orientation that covers company policies, compliance requirements, workplace expectations, and site-specific procedures. *Id.*

Beyond the core orientation, Intel assigns METs to technical onboarding modules tailored to individual fab tools on which they will be expected to work. *Id.* In the department managed by Hodgin, the team worked on four particular tools. *Id.* The training modules for each tool include web-based trainings ("WBTs") covering safety, tool operation principles, process controls, and progression requirements within Intel's technician certification ladder. *Id.* Intel combines WBTs with hands-on training. *Id.* It also assigns each new MET a trainer. *Id.* Trainers demonstrate to new METs how tools operate and how to perform service and maintenance. *Id.* Designated MET trainers partner with new METs throughout the training process, assess the trainee's mastery of tool operations, and, ultimately, recommend whether an MET should be certified on Level 1 and advance to Level 2 training. *Id.*

The training necessary to be certified at the basic training level (Level 1) generally lasts two to four months. *Id.* However, each new MET is different, and comes to Intel with differing experience, aptitude, and skillsets. Managers adjust the training timeline to meet each new MET's individual circumstances, with the overall goal being to produce master craftsman. *Id.* So long as training is successfully completed in a reasonable timeframe, neither an employee's compensation nor their future upward mobility is impacted by the time spent training at any specific level on a tool. *Id.*


**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

**B. Intel Hires Travis and Completes Basic Onboarding in July 2022**

Intel hired Travis as an MET assigned to Intel's Ronler Acres fab in Hillsboro, Oregon. Copple Dep. ¶ 2, Ex. A ("Travis Dep.") at 201:11-24, Ex. 3. Travis accepted the offer, and his employment commenced in July 2022.[2] *Id.* On July 29, 2022, Travis completed his initial onboarding. Hodgin Decl. ¶ 3. Travis's work schedule was Shift 5 (7:30 a.m. to 5:30 p.m.). *Id.*

Hodgin, the Engineering Manager, supervised the team to which Travis was assigned. At the time, Hodgin's team included approximately 17 METs, including Travis, as well as three engineers. Hodgin Decl. ¶ 3. Hodgin reported to James Schammerhorn, an Equipment Engineering Manager. *Id.*

**C. Travis Insists on Racing Through His Level 1 Training**

In September 2022, Hodgin assigned Brian Somers ("Somers") as Travis's peer trainer. *Id.* However, after three days working together, Somers requested to be reassigned, explaining that he found Travis to be abrasive and difficult to work with. *Id.* Somers also reported to Hodgin that Somers felt their personalities did not mix. *Id.* Hodgin identified Chad Chamberlain ("Chamberlain") as a replacement for Somers as Travis's trainer because Chamberlain had significant experience and was regarded as one of the most skilled and committed trainers. Hodgin hoped that Chamberlain would be able to provide Travis with more stable, consistent direction, and reduce the interpersonal friction that had arisen with Somers. *Id.*; Chamberlain Decl. ¶ 2. Hodgin relayed to Travis that Chamberlain would serve as his peer trainer. Hodgin Decl. ¶ 3.

Travis was initially pleased with the decision to have Chamberlain assigned as his peer trainer. According to Travis, Chamberlain was professional, prompt, an excellent trainer, and "a good human being." Travis Dep. at 80:3-81:8; 107:11-15. Travis felt that he and Chamberlain "worked together perfectly as a team." *Id.* Also, according to Travis, once he was assigned to train with Chamberlain, he "hit the ground [running], started working and doing what I was told

---

[2] As part of the onboarding process, Intel provided Travis with a copy of its anti-harassment, open door, and EEO policies, which, on July 13, 2022, Travis certified he read and understood. Travis Dep. at 201:11-24, Ex. 3.



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

to do, pulling my side, what I needed to do to move up the ladder." Travis Dep. at 67:16-19. Indeed, Travis acknowledged at deposition that he had no reason to believe Chamberlain held any negative attitudes towards Travis. *Id.* at 80:3-7.

Notwithstanding Travis's positive view of Chamberlain, Travis believed that Chamberlain should have certified Travis at Level 1 training more quickly than he did. On August 30, 2022, Travis met with his direct and second-level managers, Hodgin and Schammerhorn, respectively, to complain that he had not already been certified as meeting Level 1 training competencies. *Id.* at 96:21-25. In Travis's view, there was "no doubt" that he was ready to be certified by the end of August. *Id.* at 99:4-8. The managers and trainer did not agree with Travis's self-assessment, and believed he needed to continue to develop Level 1 competencies before being certified. Hodgin Decl. ¶ 4; Chamberlain Decl. ¶ 3.

On September 27, 2022, Travis threatened to report his trainer, Chamberlain, to HR if Chamberlain delayed certifying Travis as meeting Level 1 training competencies. Hodgin Decl. ¶ 4, Ex. A; Travis Dep. at 102:15-20 ("I remember explaining to Chad Chamberlain that if I'm not signed off, I would have to go and ask HR to get involved in what was going on."). Chamberlin alerted Hodgin to his conversation with Travis. Hodgin Decl., Ex. A. Hodgin subsequently notified Schammerhorn and the Human Resources Business Partner ("HRBP") about Travis's threat directed to Chamberlain. *Id.* Hodgin responded to Chamberlain: "I don't want threats to be swaying your judgment here. Someone is either ready or they are not and I'm not certifying anyone until we all agree on their status." *Id.* Ultimately, despite Travis's threat and his misguided self-assessment of his own skills, Chamberlain and Hodgin believed that Travis was not showing sufficient competency with the tool to qualify for the Level 1 certification at that time. Hodgin Decl. 4; Chamberlain Decl. 3.[3] Travis ultimately received his Level 1 certification around

[3] Travis exhibited a consistent pattern of overestimating his progress. As one Intel trainer conveyed to Hodgin, "he seem a little taken aback when I told him I had been in the same module for 17 yrs. He talked about how he is ambitious and no one can stop him get to his goal when he sets his goal." Hodgin Decl. ¶ 5, Ex. B. Likewise, at deposition, Travis claimed that despite only being at Intel for "four to six months, [he] was already level-2-ready


**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

November 6, 2022– the certification process of which was overseen by Chamberlain. Travis Dep. at 137:3-12. Travis acknowledges that, following his certification, "nothing changed" with his work. *Id.* at 137:23-25.

**D. Travis Insults Hodgin's Educational Background**

On September 7, 2022, Travis and Hodgin had a one-on-one conversation about Travis's training progress and certification plan. Travis Dep. at 115:16-116:7. During their conversation, Hodgin mentioned he was originally from Oregon. *Id.* Travis proceeded to ask Hodgin about his educational background because Travis was "trying to figure out what was [Hodgin's] way of thinking." *Id.* at 116:1-7. When Hodgin revealed that he did not have a college degree, Travis told Hodgin: "Now I know what to think about you." Hodgin Decl. ¶ 6*; see* Travis Dep. at 119:20-25; 126:11-14, Ex. 17. Hodgin was upset by Travis's comment, but did not, initially, pursue the issue. Hodgin Decl. ¶ 6.

**E. Travis Refuses to Follow Work Instructions**

In September 2022, Travis began habitually clocking in for his shift thirty minutes earlier than authorized. Travis was scheduled to start each shift at 7:40 a.m. *Id.* ¶ 7, Ex. C. Between September 18 and September 21, he clocked in early each day. *Id.* Travis clocked in early because he was reporting to a 7:15 a.m. engineer pass-down meeting for exempt employees, which Travis was not. *Id.* ¶ 8, Ex. D.

On September 25, 2022, Hodgin directed Travis, consistent with Intel timekeeping policy, to avoid clocking in more than ten minutes prior to his scheduled start time. *Id.* ¶ 7, Ex. C. As mentioned above, the engineer pass-down meeting was only for exempt employees, and Hodgin had instructed METs on his team not to attend that meeting. Travis Dep. at 150:23-152:9, 152:15-17, 152:19-22, Ex. 11. Travis, however, ignored Hodgin's directive and continued clocking in

---

certified from doing my college courses or my Intel courses, while the guy that was training me had been there seven years and wasn't there." Travis Dep. at 67:6-12.



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

early, and continued attending the engineer pass-down meetings. Hodgin Decl. ¶ 7; Travis Dep. at 129:10-12; 131:3-13. In response, on October 3, 2022, Hodgin again counseled Travis and directed him to not begin working earlier than scheduled. Hodgin Decl. ¶ 7, Ex. C. Travis admits he ignored Hodgin's instruction and that his actions were intentional; he testified:

> "Q: Do you agree that you continued to log time inappropriately after being asked not to?
>
> "A: Yes."
>
> ***
>
> "Q: [Hodgin] instructed you not to show up to those engineer meetings [at 7:15 a.m.]; right?
>
> "A: He instructed me not to show to the meetings, but that was against my job title. And Intel policy as a MET, I was supposed to be at all morning meetings.
>
> "Q: And so despite Mr. Hodgin's directive to you not to report to the engineer meetings, you continued to do so; correct?
>
> "A: I sure did . . . ."

*Id.* at 129:10-12; 131:3-13.

**F. Travis Complains to Schammerhorn About Hodgin's Directives and Doubles Down on His Own Policy Violations**

On October 5, 2022, Travis and Schammerhorn (Travis's second-level manager) met to discuss Hodgin's directives that Travis not attend the pass-down meeting for engineers and that Travis not clock in more than 10 minutes before his scheduled shift. Hodgin Decl. ¶ 7, Ex. C. Travis told Schammerhorn that Hodgin previously approved him working overtime "whenever he needed," but that Hodgin's more recent directive prevented him from attending the engineer meetings. Schammerhorn Decl. ¶ 2, Ex. A. Schammerhorn asked Travis whether there was not simply a misunderstanding in their communications. *Id.* In response, Travis asked Schammerhorn



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

where he went to school. *Id.*; Travis Dep. at 132:22-25. According to Travis, Schammerhorn responded by asking why it mattered and saying it did not matter where he went to school because "I'm a redneck now." Travis Dep. at 134:18-25, 135:13-16. In response, Travis threatened to no longer speak to Schammerhorn and stated that their meeting "would be the last time [Travis] would ever talk to [Schammerhorn]." Schammerhorn Decl. ¶ 2, Ex. A; Travis Dep. at 128:16-20. Travis also informed Schammerhorn that he was going to "continue to do what he had been doing," *i.e.,* continue violating Intel policy not to clock in more than 10 minutes prior to shift and to disregard the directive by Hodgin to clock in at the appropriate time. Travis Dep. at 136:19-23.

### G. Hodgin Issues Travis a Documented Coaching

Intel maintains several Employment Guidelines, including some that provide guidance on disciplinary processes. The level of discipline imposed for Guideline violations may vary based on the circumstances of the misconduct or performance issue, but generally involve oral or documented coaching, Written Warning ("WW"), Permanent Written Warning ("PWW"), or termination. Managers may seek guidance from an HRBP about performance or conduct issues that may lead to potential discipline.

On October 9, 2022, Hodgin met with Travis to deliver documented coaching concerning their recent interactions. Travis Dep. at 110:24-111:9, Ex. 7. First, they discussed that Travis was not adhering to Intel's Code of Conduct. *Id.* Hodgin cited the two earlier instances in which Travis probed his managers about where they went to school, then remarked that he now "knew what to think about you." *Id.* Hodgin also cited Travis's threat to Chamberlain to involve HR if Chamberlain delayed certifying his training. *Id.* Second, Hodgin coached Travis for arguing about timecard protocols, threatening to no longer communicate with Schammerhorn, and arguing over the training plans. *Id.*

///

///



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

### H. Hodgin Submits an Open Door Complaint and Intel Initiates an Investigation

Intel's Open Door process is an internal mechanism that allows employees to raise workplace concerns directly to management, HR, Ethics & Legal Compliance, or other designated channels, with the expectation that the Company will review the concern and if appropriate, address and remedy the underlying issue. The Company's policies and guidelines prohibit retaliation.

On October 14, 2022, Hodgin escalated the concerns noted in the earlier coaching document and filed an Open Door complaint. Hodgin Decl. ¶ 9, Ex. E. Hodgin reported that he felt Travis's behaviors were bullying, threatening, and violated Intel's Anti-Harassment Guideline, Code of Conduct, and workplace behavior guidelines. *Id.* Specifically, Hodgin believed that Travis questioning Hodgin's education level and background, and responding with disrespectful comments, were inconsistent with Intel's expectations for employees. *Id.*

### I. Hodgin Also Initiates a Written Warning to Travis After Further Insubordination

Travis freely admits that he failed to follow instructions from Hodgin. Travis Dep. at 148:9-14. Travis "totally" agrees that he was asked not to attend engineer pass-down meetings. Travis also agrees that he failed to comply with Hodgin's instructions not to attend the engineering meeting or arrive at work early. *Id.* at 148:15-19.

As a result, on October 31, because Travis continued to ignore Hodgin's direction to not attend engineering pass-down meetings, Hodgin began the process to issue Travis additional disciplinary action for Travis's insubordination – following the already issued October 9 documented coaching. Hodgin Decl. ¶ 10, Ex. F. Hodgin consulted with and received guidance from Intel HR before issuing the discipline. *Id.*

### J. Intel Investigates Hodgin's Open Door Complaint and Travis Responds by Filing His Own Internal Complaint

After receiving Hodgin's Open Door complaint, Intel assigned an investigator to



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

investigate (*i.e.* to complete the "Open Door Investigation," or "ODI"). Travis Dep. at 87:11-22, Ex 17. As part of the ODI, on November 2, 2022, the investigator interviewed Travis and others. *Id.* After Travis was asked questions about his conduct, Travis responded the same day by filing his own Open Door complaint about Hodgin. *Id.*

In Travis's cross-complaint, Travis reported that Hodgin made disparaging comments about his veteran status. According to Travis, Hodgin commented that he "didn't give a fuck about [Travis] being a veteran," and "he [Hodgin] knew a bunch of veterans that have blew up shit and killed mother fuckers." *Id.* Travis also reported that Schammerhorn described himself as a "redneck" when responding to Travis's questions about Schammerhorn's education. *Id.* Travis further complained that Hodgin had stated he hated technical people because they were difficult to train. Finally, Travis took issue with the feedback he received regarding his progress towards the Level 1 certification. *Id.*

**K. Travis Receives His Level 1 Certification in Early November**

Ultimately, Chamberlain and Hodgin agreed that Travis was ready to achieve Level 1 certification on the Rapid Thermal Anneal tool. Travis received his Level 1 certification around November 6, 2022. Travis Dep. at 137:3-12. The certifying process was overseen by Chamberlain. Travis acknowledges that, following his certification, "nothing changed" with his work assignments or compensation. *Id.* at 137:23-25.

**L. Hodgin Issues a Written Warning**

In early November, Hodgin continued to work on the pending Written Warning related to Plaintiff's continuing disregard of Hodgin's instruction not to attend the engineer pass-down meeting and abide by Intel's timekeeping policies. On November 7, 2022, Hodgin drafted the PWW. Hodgin Decl. ¶ 11, Ex. G. Hodgin's shared the draft PWW with Schammerhorn and the HRBP. Hodgin Decl., Ex. H. Hodgin delayed delivering any discipline to Travis to allow the ODI



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

investigation to finish. *Id.* at ¶ 12.

The ODI investigator ultimately recommended that Travis's misconduct be addressed with a Permanent Written Warning ("PWW"). However, Hodgin and Schammerhorn elected to issue a Written Warning, which is less severe discipline than a PWW. *Id.* On November 16, 2022, Hodgin delivered the Written Warning to Travis, citing Travis's prior insubordination and his failure to follow instructions concerning his attendance at engineer meetings. Travis Dep. at 147:9-23, Ex. 23.

**M. Travis Takes More Than 13 Months of Medical Leave, then Requests Twelve Additional Months of Additional Medical Leave**

Travis claims that, in and around October 2022, he became distraught about work. Travis Dep. at 155:23-156:3. In response, he commenced intermittent medical leave in October 2022. He transitioned to continuous medical leave starting December 5, 2022. Hodgin Decl. ¶ 13, Ex. I. Intel's leave administrator approved Travis's leave requests as well as multiple requests for extensions throughout 2023. *Id.* Travis was on medical leave for the entirety of 2023 and continuing into early 2024. *Id.*

After Travis had been on continuous leave for thirteen months, on January 18, 2024, his health care provider submitted documentation indicating that Travis remained unable to perform essential job functions with or without reasonable accommodation and that Travis required at least twelve additional months of continuous leave, through at least January 18, 2025. Travis Dep. 161:21-163:17, Ex. 26**.** In the January 2024 documentation, the health care provider answered "No" to the question: "Is the employee able to perform the essential functions of their job with reasonable accommodation?" *Id.* In response to the question "When is the anticipated date they may be able to perform essential job functions," the health care provider responded "1/18/2025." *Id.* Even then, Travis's health care provider only believed there was a 75% chance that Travis could return in January 2025. *Id.* As it turned out, as of Travis's November 2025 deposition (almost



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

three years after commencing continuous leave), Travis admitted that he still could not work in any capacity. Travis Dep. at 163:22-164:23.

On February 14, 2024, Intel's Accommodation Team Specialist responded to Travis's leave extension request:

> After careful consideration of your request to extend your continuous job-protected leave to January 18, 2025, I write to inform you that we are unable to grant this extension. While Intel has supported you with job-protected leave since December 6, 2022, Dr. Tragakis has stated that you are not released to return to work, either with or without reasonable accommodation and, moreover, you will not be released to return to work in the foreseeable future. Rather, the soonest your healthcare provider anticipates you may be able to return to work is January 18, 2025.
>
> Given these circumstances and considering that you have exhausted all available leave under Intel's policies and applicable law, we are at the point where we need to move forward with administratively terminating your employment. However, even though under no obligation to do so, Intel has decided to extend your ADA job-protected leave until February 20, 2024. This extension ensures that you'll have continued access to medical benefits through the end of February.

Travis Dep. at 166:19-167:7, Ex. 27. Accordingly, Intel processed Travis's separation, effective February 20, 2024. *Id.* Hodgin and Schammerhorn played no role in that decision. Hodgin Decl. ¶ 14; Schammerhorn Decl. ¶ 4. While on leave– on May 8, 2023, Plaintiff filed an EEOC complaint. Compl. ¶ 198.

### N. Legal Standards for Summary Judgment

Summary judgment is not a disfavored procedural shortcut; rather, where appropriate, it furthers the just and speedy determination of an action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is appropriate where the moving party shows that no genuine issue exists as to any material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). A defendant need not negate a plaintiff's claims, but only establish a lack of evidence to support them. *Celotex*, 477 U.S. at 322; *Devereaux*, 263 F.3d at 1076 (*citing Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000)). Once a defendant satisfies its



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

burden, a plaintiff may not rest on mere allegations or denials but must present evidence showing a triable issue of fact. *Id.* To sustain her burden, Plaintiff must adduce relevant, admissible evidentiary matter setting forth specific facts based on personal knowledge. Fed. R. Civ. P. 56(e). When, as here, Plaintiff cannot meet this burden, summary judgment must be granted.

## III. LEGAL ARGUMENT

### A. Plaintiff's Disability Discrimination (Claim 12) Fails as a Matter of Law

Plaintiff's disability-discrimination claim fails because he cannot establish that he was a "qualified individual" capable of performing the essential functions of his position with or without reasonable accommodation, as required by ORS 659A.112. To state a viable claim, a plaintiff must show that (1) he is an otherwise qualified individual; (2) he was subjected to discrimination, including a failure to accommodate; and (3) the adverse treatment occurred because of a physical or mental impairment. ORS 659A.112(1); OAR 839-006-0200(2).

Furthermore, the Oregon District Court applies a burden shifting analysis. Under the first step of the burden shifting regime, the plaintiff must make a prima facie showing. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate and nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 804. From there, the burden shifts back to the plaintiff to provide evidence that the employer's stated reasons are pretextual. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

#### 1. Plaintiff Cannot Establish His Prima Facie Case

The record forecloses a threshold element of Plaintiff's case. At the time Intel terminated Plaintiff's employment (February 2024), Travis was not a qualified individual. A qualified individual is someone who can perform the essential functions of a position with or without a reasonable accommodation. 42 U.S.C. § 12111(8). Plaintiff concedes that he was unable to work



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

due to his mental health condition and could not return to employment regardless of the accommodation offered. Travis Dep. 161:21-163:17, Ex. 26**.** His health care provider further indicated in January 2024 that, after Travis had already taken thirteen months of leave, Travis was unable to perform essential job functions, even with accommodation, and that Travis required at least an additional twelve months of leave. *Id.* An employee who is wholly unable to work cannot perform the essential functions of the position.

Moreover, as of February 2024 – when Intel processed the termination, there was no reasonable accommodation that would have enabled Plaintiff to perform the essential functions of his position. Rather he sought only an extended leave. In February 2024, after Travis had taken fourteen months of leave, Intel terminated his employment when he sought to extend his absence to January 2025. Notably, Plaintiff's physician only noted a 75% likelihood that he would be able to return to work if Intel allowed him to take more than two years of leave. Travis Dep. 161:21-163:17, Ex. 26**.** However, as of November 2025 – nearly three years after his last day worked – Plaintiff remained unable work. Travis Dep. at 163:22-164:23. An employer is not required to grant an indefinite leave as an accommodation. *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 2008 U.S. Dist. LEXIS 98960, at *33-34 (N.D. Cal. 2008) (holding that after granting a year of leave, an employer need not wait indefinitely for an employee's condition to improve). As the Ninth Circuit explained, "Requesting an indefinite leave of absence is unreasonable as a matter of law. For a requested accommodation to be reasonable, the plaintiff must present evidence of the impairment's expected duration, and not the duration of the leave request." *Larson v. United Nat. Foods W. Inc.*, 518 F. App'x 589, 590 (9th Cir. 2013). Plaintiff identifies no finite end date for leave – only a possibility that he may have been able to return in January 2025 after more than 25 months of medical leave. And as Plaintiff testified at his November 2025 deposition, he would have required leave upwards of at least three years, as he remained unable to return to work in any capacity at that time.



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

**2. Plaintiff Cannot Show Pretext**

To the extent Plaintiff argues that Intel terminated his employment based on his disability, such a claim fails because Intel can offer a legitimate non-discriminatory reason for Plaintiff's termination, and Plaintiff cannot show pretext. Intel afforded Plaintiff thirteen months of leave, then made the decision to terminate Plaintiff's employment only after Plaintiff's health care provider indicated he could not perform the essential functions of the position for at least another twelve months. Plaintiff cannot show that Intel's reason for the challenged action was pretextual. Plaintiff cannot point to any animus held by anyone involved in the termination decision. Intel did not terminate Plaintiff's employment when he first went out on leave; instead, it extended Travis leave for more than a year while he remained unable to perform his job functions. Neither Hodgin or Schammerhorn played any role in the termination decision. The decision to approve extensive leave and the temporal gap between the initial leave request and ultimate termination decision defeats any suggestion that Intel's Accommodation Team Specialist was motivated by discriminatory or retaliatory motives.

**B. Plaintiff's Race & Color Discrimination (Claims 1, 2, 5 & 6) Fail as Matter of Law**

To survive summary judgment on a race or color discrimination claim, a plaintiff must first establish that: (1) he belongs to a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *Mays v. United Ass'n Local 290 Apprenticeship*, 2019 U.S. Dist. LEXIS 151059, at *37–38 (D. Or. 2019). Burden shifting likewise applies to Plaintiff's discrimination claims.

**1. Plaintiff Cannot Establish a Prima Facie Case**

As a threshold matter, Travis cannot establish an adverse employment action. In the context of a discrimination claim, an adverse action is "a significant change in employment status, such as



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hess v. Multnomah Cty.*, 216 F. Supp. 2d 1140, 1154 (D. Or. 2001); ORS 659A.030.

Plaintiff's allegations regarding Intel's management and training do not involve actionable employment decisions. Courts consistently hold that increased supervision, heightened scrutiny, or ordinary managerial interventions do not constitute adverse employment actions for Title VII purposes unless those actions result in "unfavorable consequences." *Scafidi v. Baldwin Union Free Sch. Dist.*, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003); *Hess*, 216 F. Supp. 2d at 1154. Here, while Plaintiff wishes to complain that his Level 1 certification was delayed for improper reasons, he ultimately received the certification that he sought. The alleged delay did not impact Plaintiff's pay, title, promotional opportunities, or any other tangible term of employment. *Hess*, 216 F. Supp. 2d at 1154 (holding denying training is not an adverse action when it does not result in a denial of an increased salary or promotion). Because the timing of Plaintiff's training certification did not alter his employment status or result in any material harm, the alleged delays in certifying Plaintiff cannot support a discrimination claim as a matter of law.

Nor can Plaintiff reasonably argue that documented coaching or his Written Warning amounted to an adverse action. *Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094, 1104 (D. Or. 2010) (warning letter with no materially adverse change in the terms and conditions of the plaintiff's employment was not an adverse employment action); *Tudor Delcey v. A-Dec, Inc.*, 2008 U.S. Dist. LEXIS 2167, 2008 WL 123855, at *9 (D. Or. 2008) (written warning not an adverse employment action when it had no impact on the employee's status).

Further, with respect to the challenged termination decision, Plaintiff cannot satisfy the requisite showing of causation. Plaintiff's termination occurred after he had been on medical leave for more than thirteen months and only after he requested to extend his leave by at least an additional year. As discussed above, Intel appropriately denied the request because it was not reasonable. *Larson v. United Nat. Foods W. Inc.*, 518 F. App'x 589, 590 (9th Cir. 2013).



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

Moreover, the decision to terminate Travis's employment was made by Intel's Accommodation Team Specialist. There is no evidence that Hodgin or Schammerhorn played any role in the termination decision. Hodgin Decl. ¶ 14; Schammerhorn Decl. ¶ 3. As a result, even if Plaintiff could prove that Hodgin or Schammerhorn held racial animus (which he cannot), he cannot tie the alleged animus to Intel's termination decision.

### 2. Plaintiff Cannot Show Pretext over Defendant's Non-Discriminatory Reason for Terminating His Employment

Even if Plaintiff could establish a prima facie case, Intel can comfortably articulate a legitimate, non-discriminatory reason for the challenged actions. With respect to Plaintiff's separation, Intel appropriately terminated his employment after Plaintiff requested indefinite leave exceeding at least 25 months, which is not reasonable, as discussed above.

As for the performance management, Plaintiff *admitted* at deposition that he engaged in the conduct forming the basis for his documented coaching and Written Warning. Intel's disciplinary action was unquestionably an appropriate exercise of managerial discretion and prerogatives. Intel managers issued Travis discipline following guidance from HR and a recommendation by the investigator. Finally, to the extent that Plaintiff believes his Level 1 certification was improperly delayed, the timing for the certification decision was made jointly by Hodgin and Chamberlain based on gaps in Plaintiff's knowledge and demonstrated skills. As Plaintiff acknowledged at deposition, Chamberlain was an excellent trainer who held him no ill-will. Plaintiff cannot reasonably challenge Chamberlain's decision making as discriminatory while also admitting that Chamberlain never discriminated against him.

Plaintiff cannot offer evidence to suggest these explanations are pretextual. The only evidence Travis offers to support his assertion that Hodgin or Schammerhorn were motivated by unlawful prejudice are two innocuous and stray remarks. Both comments are unrelated to any challenged employment action and, ultimately, are insufficient to maintain a discrimination claim.



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

The first– Schammerhorn's purported self-description as a "redneck" after Travis pressed Schammerhorn about his education– is not direct evidence of discriminatory motive nor does it reasonably reflect any underlying prejudice. *See Redwind v. W. Union, LLC*, 2016 WL 3606595, *9 (D. Or. 2016) ("To the extent Redwind argues Western Union and the declarants acted with the improper purpose of discrimination and retaliation, Redwind produces nothing in support of her argument besides speculation and conjecture. This is not enough to defeat a motion for summary judgment."). The second – Hodgin's alleged remark that Intel made a mistake when hiring "you people" – is likewise not direct evidence. First, the comment is not racial on its face. *Schnidrig v. Columbia Machine, Inc.*, 80 F.3d 1406 (9th Cir. 1996) (holding ambiguous statements are not direct evidence of discrimination). Even if the comment could be considered racial, it is, at best, a stray remark insufficient to show discriminatory animus. *Hartung v. Cae Newnes, Inc.*, 229 F. Supp. 2d 1093, 1100 (D. Or. 2002) ("The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.").

In short, Plaintiff's race and color discrimination claims rest entirely on subjective perceptions and isolated workplace frustrations, not actionable evidence. Without direct or circumstantial proof of discriminatory intent and without any materially adverse employment action linked to race, Plaintiff's claims cannot survive summary judgment.

### C. Plaintiff's Veteran Status Discrimination (Claims 3, 4, 7 & 8) Fail as a Matter of Law

Plaintiff's veteran-status discrimination claims under USERRA and ORS 659A.082 likewise fail as a matter of law. To prevail, he must show that his veteran status was a "substantial or motivating factor" in an adverse employment action. *Leisek v. Brightwood Corp.*, 2000 U.S. Dist. LEXIS 11707, at *8 (D. Or. 2000). Plaintiff cannot identify an issue of fact at either the prima facie or pretext level.



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

**1. Plaintiff Cannot Establish a Prima Facie Case**

As noted above, there is no adverse action at issue. To the extent Plaintiff attempts to rely on workplace criticism or disagreements about his training or his training schedule as the basis for his discrimination claim, courts consistently hold similar such criticism– without tangible consequences– is not an adverse employment action. *Nelsen v. McHugh*, 2011 U.S. Dist. LEXIS 87022, at *51 (D. Or. 2011). Thus, even accepting Plaintiff's allegations as true, the conduct he describes is legally insufficient to prove a violation of USERRA or ORS 659A.082.

Plaintiff likewise cannot show that his veteran status was a motivating factor in his termination. As outlined above, the termination of Plaintiff's employment occurred only after he had been on leave for more than thirteen months and following his health care provider's statement that he required at least another year off work before potentially being able to return. Intel's termination decision had zero connection to Plaintiff's veteran status. The lack of connection is self-evident.

Plaintiff's claim also fails at the pretext level because Plaintiff identifies no similarly situated non-veteran comparators treated more favorably. In fact, he conceded in deposition that other employees who worked in proximity to Hodgin and who regularly wore veteran-themed apparel did so without incident. Travis Dep. at 92:20-93:9; 94:4-12. Plaintiff's admission undercuts any possible inference that Intel managers harbored discriminatory animus toward veterans or that Plaintiff was singled out for negative treatment based on his military background.

Nor is there circumstantial evidence capable of suggesting a discriminatory motive. The sole comment Plaintiff relies on – Hodgin's alleged statement that Hodgin "didn't give a fuck" about Plaintiff being a veteran – is isolated, uncorroborated, and unconnected to any adverse action. *Hartung.*, 229 F. Supp. 2d at 1100.

As a whole, Plaintiff's USERRA and ORS 659A.082 theories rest entirely on a single alleged remark and Plaintiff's generalized dissatisfaction with aspects of his training. Those



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

allegations do not meet the statutory causation standard. Moreover, Hodgin had no input into the decision to terminate Plaintiff's employment. Because the undisputed record contains no evidence that his veteran status played any role – let alone a motivating role – in any adverse employment decision, Intel is entitled to summary judgment.

**2. Plaintiff Cannot Show Pretext**

Even if Plaintiff could establish a prima facie case, Defendants had a legitimate non-discriminatory based on reason for each the challenged actions. As explained above, Plaintiff's termination was because his request for at least an additional year of leave, which was not reasonable. Likewise, Defendants' training and discipline decisions were supported by a legitimate business rationale. As above, Plaintiff cannot establish that those decisions were pretextual.

**D. Plaintiff's Whistleblower Retaliation (Claims 9 & 10) Fail as a Matter of Law**

To establish retaliation under ORS 659A.030(1)(f) or ORS 659A.199, a plaintiff must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link connects the two. *Larmanger v. Kaiser Foundation*, 895 F. Supp. 2d 1033, 1049 (D. Or. 2012). Even assuming Plaintiff engaged in protected activity when he filed an internal cross-complaint through Intel's ODI process, Plaintiff's claim fails on the remaining elements. Likewise, he cannot rebut the legitimacy of Intel's decision.

**1. Plaintiff Cannot Establish a Prima Facie Case**

As above, Plaintiff cannot show an adverse employment action. "Trivial harms" or "minor annoyances" cannot support a claim of retaliation. *Annenberg v. Clark Cty. Sch. Dist.*, 818 F. App'x 674, 677 (9th Cir. 2020). Instead, a plaintiff must show "retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Plaintiff's dissatisfaction with the timing of his Level 1 certification completion does not



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

give rise to an actionable retaliation claim. His Level 1 certification was ultimately issued in early November, and he identifies no loss of compensation, rank, or eligibility resulting from the alleged delay.

Any argument that the November 16, 2022, Written Warning was causally connected to his internal complaints likewise fails. As explained above, Hodgin initiated the Written Warning process the week *prior* to Travis's ODI cross-complaint. Moreover, the Written Warning was issued with guidance from Intel's HR department and in accordance with the recommendation of the Investigator's findings. In short, the warning was vetted and deemed to be justified by business reasons.

Nor can Plaintiff establish the necessary causal connection between his purported protected activity and his termination. Intel only terminated Travis's employment after he could not return to work after he had already been off work for fourteen months. Moreover, the record reflects intervening favorable conduct by Intel– most notably, its substantial accommodation of Plaintiff's extended and indefinite leave period. Such intervening supportive actions break any possible inference of retaliatory motive and preclude an inference of causation. See *Mays v. United Ass'n Local 290 Apprenticeship*, 2019 U.S. Dist. LEXIS 151059, at *37-38 (D. Or. 2019).

**2. Plaintiff Cannot Show Pretext**

Plaintiff conceded at deposition that he engaged in the misconduct that resulted in his November 16 Written Warning. It is thus undisputed that Intel had a legitimate business reason for the challenged discipline and Plaintiff can show no pretext. There is no evidence that other, non-complaining employees engaged in similar misconduct and were not disciplined.

Because Plaintiff cannot show a materially adverse action linked to protected activity, cannot establish causation, and cannot rebut Intel's legitimate business reasons for his separation, his retaliation claims under ORS 659A.030(1)(f) and ORS 659A.199 fail as a matter of law.



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

**E. Plaintiff's ORS 659A.230 Retaliation for Initiating/Aiding Civil or Criminal Proceedings (Claim 13) Fails as a Matter of Law**

Plaintiff's claim with respect to ORS 659A.230 is largely duplicative of his other retaliation claims. However, here, he claims he was retaliated against for filing an EEOC charge. In addition to the reasons why he cannot establish his other retaliation claims, he also cannot show a violation of ORS 659A.230 based on the timeline of events. Plaintiff filed an EEOC complaint on May 8, 2023. Compl. ¶ 198. Any decision made prior to May 8, 2023 plainly could not be in retaliation for the EEOC charge. *See Folz v. ODOT*, 287 Or. App. 667, 677, 404 P3d 1036 (2017) ("Where the decision to take an adverse employment action is made prior to any protected activity, no factfinder could find the requisite causal link between the employment action and the protected conduct."). The only challenged action postdating Plaintiff's EEOC charge is his February 2025 termination. However, as explained above, Defendants had a legitimate business reason for ending Plaintiff's employment. Intel's termination decision had no relation to the charge. Plaintiff can put forth no evidence that those legitimate business reasons were pretextual.

**F. ORS 659A.030(1)(g) – Aiding and Abetting Discrimination Against Individual Defendants (Claim 11) Fails as a Matter of Law**

Finally, Travis alleges Hodgin and Schammerhorn aided or abetted Intel's discrimination in violation of ORS 659A.030(1)(g). This claim is derivative of his discrimination and retaliation claims and fails for the same reasons. *Ewing v City of Toledo*, 2020 U.S. Dist. LEXIS 65360 (D. Or. 2020) (dismissing aiding and abetting claims against individual defendants because the underlying claims against the employer were dismissed). As discussed above, and Travis concedes he engaged in the misconduct that ultimately led to the Written Warning, which was implemented in accordance with Intel's guidelines and with the support of HR. Dispositively, neither manager was involved in the termination decision.

///

///



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

## IV. CONCLUSION

Based on the foregoing, Defendants respectfully request this Court grant the instant Motion for Summary Judgment in its entirety.

DATED: October 6, 2026.

Respectfully submitted,
JACKSON LEWIS P.C.

By: *s/ Anthony Copple*
Mark Crabtree, OSB #015070
mark.crabtree@jacksonlewis.com
Anthony Copple, OSB #163651
anthony.copple@jacksonlewis.com
Attorneys for Defendant



**Jackson Lewis P.C.**
200 SW Market Street, Suite 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)

**DECLARATION OF SERVICE**

I hereby certify that I served the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** via:

- ☐ Electronic Mail
- ☐ US Postal Service
- ■ CM/ECF
- ☐ Facsimile Service
- ☐ Hand Delivery
- ☐ UPS

as follows on the date stated below:

Everette Travis
821 Enys Way
McKinney, TX 75069

*Pro Se Plaintiff*

DATED: October 6, 2026.

By: *s/ Janessa Stokes*
Janessa Stokes

4900-6524-3938, v. 1



**Jackson Lewis P.C.**
200 SW Market St. Ste. 540
Portland OR 97201
(503) 229-0404 | (503) 229-0405 (fax)